DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} Tonya Linkous was strangled to death on New Year's Day, 2005. A jury found Shawn Kelley, who was in the same room in which Ms. Linkous died at the time of her death, guilty of feloniously assaulting and murdering her. It also found him guilty of felonious assault, attempted murder, and attempted aggravated murder in connection with each of two other people who were in the house at the time Ms. Linkous died. Mr. Kelley has denied that he strangled Ms. Linkous or attacked the other two people. He has suggested that another person, Ms. Linkous's boyfriend, came to the house and into the room where he and Ms. *Page 2 
Linkous were sleeping and strangled her without awakening him. He has also asserted that, rather than he attacking the other two people, they attacked him.
 {¶ 2} This Court affirms Mr. Kelley's convictions because: (1) they are supported by sufficient evidence and are not against the manifest weight of the evidence; (2) the trial court did not err by denying his motion for acquittal on the attempted aggravated murder charges on which he was convicted because there was sufficient evidence on those charges at the close of the State's case and, if it erred by not acquitting him of the other charges about which he has complained, that error was harmless beyond a reasonable doubt because the jury found him not guilty on some of those charges and the trial court did not sentence him on the others; (3) the trial court did not err by denying his motion to sever the charges related to Ms. Linkous's death from the charges related to his alleged attacks on the other two people; (4) Mr. Kelley was not denied a fair trial because of alleged prosecutorial misconduct; (5) he was not unduly prejudiced by the admission of certain photographs; (6) he was not denied due process by this Court's briefing schedule; and (7) his constitutional rights were not violated by the sentences imposed on him.
 FACTS {¶ 3} On the afternoon of December 31, 2004, Tonya Linkous borrowed her mother's car and, at around 3:00 p.m., picked up her boyfriend after he was done working. He cashed his pay check, and they went to the Time Out, a bar in *Page 3 
Lorain. At around 6:30 p.m., Tammy Lutz, who Ms. Linkous had previously known, showed up at the Time Out, and she, Ms. Linkous, Ms. Linkous's boyfriend, and another woman had a few drinks and talked. At some point, Ms. Linkous's boyfriend was ready to go home, but she was not. He gave her some cash and, despite the fact that his driver's license was suspended, drove her mother's car to the apartment he shared with her, her mother, and her six-year-old daughter.
 {¶ 4} At around 10:00 p.m., Ms. Linkous and Ms. Lutz left the Time Out and visited a bar in Elyria. They returned to the Time Out around 1:00 a.m. on New Years Day and stayed there until closing time, 2:30 a.m. At some time during their second visit to the Time Out, they were joined by Charles Baker.
 {¶ 5} As Ms. Linkous, Ms. Lutz, and Mr. Baker were leaving the Time Out, they ran into Shawn Kelley and Brandon Wilhelm in the parking lot. Messrs. Kelley and Wilhelm had come to the Time Out in Mr. Wilhelm's truck, but, as they were trying to leave, he was having trouble getting the truck started. Mr. Wilhelm and Ms. Lutz had previously met on one or two occasions, but, beyond that, the members of Ms. Linkous's group and the members of Mr. Kelley's group had not known each other before that morning. They struck up a conversation about the truck, and Mr. Baker tried to help determine why it would not start. Eventually, Mr. Wilhelm realized that he had somehow gotten Mr. Kelley's keys by mistake, and, when he attempted to start the truck using his own key, it started. *Page 4 
 {¶ 6} Once Mr. Wilhelm got his truck started, Ms. Linkous decided to leave with him and Mr. Kelley. Mr. Baker and Ms. Lutz went to Mr. Baker's house in Amherst, and Mr. Wilhelm, Mr. Kelley, and Ms. Linkous went to a house in Lorain, where Mr. Wilhelm and Mr. Kelley had bought and used cocaine earlier in the evening and where Mr. Kelley had left his car. After spending some time there, they also went to Mr. Baker's house, arriving sometime between 4:30 and 5:00 a.m. Ms. Linkous rode to Mr. Kelley's house with Mr. Wilhelm, and Mr. Kelley drove his car there.
 {¶ 7} Once all five were at Mr. Baker's house, they spent some time talking, and some of them drank more alcohol. Ms. Linkous, Mr. Wilhelm, and Mr. Kelley twice went to the upstairs bathroom and "snort[ed]" cocaine. Mr. Wilhelm left Mr. Baker's house to go home between 5:30 and 5:45 a.m.
 {¶ 8} At some point after Mr. Wilhelm left, first Ms. Lutz and then Mr. Baker went upstairs to sleep in Mr. Baker's bedroom, leaving Ms. Linkous and Mr. Kelley in the first-floor living room. According to Mr. Kelley, Ms. Linkous then started asking him about the chances of getting some more cocaine if they went back to the house where they had been before coming to Mr. Baker's. He claimed that he told her he was not going to do that, and she asked whether he would be able to get her some cocaine in the future. According to him, he initially resisted, but eventually accepted a blank, unsigned check from her, supposedly to be cashed by him and the proceeds used to purchase cocaine for her. He testified *Page 5 
that she said she would give him the blank check, which he put in his wallet, and if, in the morning, he was willing to get the cocaine, she would fill it out and sign it.
 {¶ 9} According to Mr. Kelley, while Ms. Linkous was getting the check from her purse, he moved next to her on the loveseat, where she had been sitting. He testified that she began flirting with him while they were talking about the check, and, once she had given it to him, they began kissing. He claimed that she unbuckled his pants and he unbuckled her pants and took her shirt off. He further claimed that he moved her bra to the side and kissed her breasts, that they both took their underpants off, and that they "started rubbing together." But then, according to him, she started "kind of pulling away" and told him she had a boyfriend. He said she then pulled up her underpants and put her shirt back on and he put his pants and shoes on; they talked a little more about him getting cocaine the next day; and he fell asleep on the couch in the living room.
 {¶ 10} Mr. Kelley testified that he awoke once, went upstairs, and used the bathroom. He returned to the couch and went back to sleep. He said that he awoke again and went upstairs to ask if Ms. Lutz needed a ride home. According to him, he pushed the bedroom door open, and Mr. Baker looked at him, asked what he was doing in his room, jumped up, and came around the bed after him with a steak knife. He said they struggled, and he pushed Mr. Baker onto the waterbed on which Mr. Baker and Ms. Lutz had been sleeping: *Page 6 
 We were struggling at that point in time. And at that point I was able to take Mr. Baker and put him onto the bed. When he went on the bed, I went with him onto the waterbed. And we struggled.
 He was — He had the knife in his hand. He had it in his right hand. And I kept grabbing hold of it, and just pushing down. And the motion of the bed, he just, he was getting stabbed.
 But Mr. Baker never stopped. He continued the struggle with me.
 And we were wrestling. And the last time that Mr. Baker struggled was because he was getting hit, he actually turned the blade away so it wouldn't hit him, and at the same time, I pushed, and he turned his head, and that's the one that went across his throat. And at that point Mr. Baker went limp. He just laid there.
 {¶ 11} In the meantime, according to Mr. Kelley, Ms. Lutz had gotten up from the bed and had run downstairs. He testified that he took the knife from Mr. Baker's hand and went downstairs to the living room to call 911. As he was dialing the telephone, according to him, Ms. Lutz, whom he estimated was 5 feet 6 or 7 inches tall and weighed between 130 and 140 pounds, came out of the kitchen and attacked him. (He was 6 feet 3 inches tall and weighed 350 pounds.) He claimed they struggled through the kitchen and fell near steps that led to the basement. According to him, Ms. Lutz grabbed the knife, which he still had in his hand, broke the blade off, and started stabbing him with the blade. They continued to struggle until Mr. Baker came into the kitchen, grabbed a frying pan, and attacked him with it. He testified that Mr. Baker hit him at least three times with the frying pan; once in the area of his left elbow, once on the side of his head, and once more. According to him, he then remembers "hitting the couch," but *Page 7 
remembers nothing else until he was in an ambulance. He testified that Ms. Linkous was on the love seat while his struggle with Mr. Baker and Ms. Lutz was going on:
 [Ms. Linkous] was sitting on the loveseat with her head up against the back of the couch, and she had the blanket on, so it was over her head, like she was sleeping. And she was in a fetal position where you could see just the bottom, from between her knee and her ankle, you could see some of her calf area.
 {¶ 12} Mr. Baker and Ms. Lutz told a far different story. According to Mr. Baker, he was sleeping in the nude on his stomach when he was awakened by someone being on top of him and stabbing him. He said that person, whom he realized was Mr. Kelley, rolled him over and "slit [his] throat." He testified that he told Ms. Lutz, who was also naked, to get up and run, which she did. According to Mr. Baker, Mr. Kelley then got off him and went after Ms. Lutz. Mr. Baker lay there for a second or two, got up, put his pants on, and went downstairs. He said that, as he was descending the stairs, he saw Ms. Linkous on the loveseat. According to him, she was slumped over facing forward, her shirt was pulled up exposing her breasts, and she was wearing underpants.
 {¶ 13} Mr. Baker said he heard Ms. Lutz screaming for help and, when he went around the corner to the dining room, saw her sitting on the floor. Mr. Kelley was behind her on his knees punching her. According to Mr. Baker, Mr. Kelley was wearing a pair of Mr. Baker's white work gloves. Mr. Baker said he yelled at Mr. Kelley, asking him "what the hell he was doing," and Mr. Kelley *Page 8 
stood up and punched him in the face. Mr. Baker fell backwards and, for the first time, realized that he was bleeding from the knife wounds he had received upstairs. He said he stuck his fingers in a hole in his neck to stop the bleeding. He then went into the kitchen, grabbed a frying pan, and started beating Mr. Kelley with it. He testified that he struck Mr. Kelley at least five times before the frying pan broke. He said Ms. Lutz got free, and they both ran to the front door, which he could not immediately open because someone had locked it with the deadbolt, which he testified he never did. Once he got the door open, he and Ms. Lutz, who was still naked, ran to different neighboring houses.
 {¶ 14} Ms. Lutz testified that she was awakened by the movement of the waterbed, turned to see what was going on, and saw Mr. Kelley punching Mr. Baker. She said she screamed, asking what was going on, and, when Mr. Baker did not answer, pushed him with her hand, which "slid in blood." She then ran downstairs and tried to get out the front door, which she was unable to open. She ran to the side door, but, before she could get it open, Mr. Kelley came up behind her and grabbed her hair. He pinned her against the wall and began stabbing at her with a steak knife. Like Mr. Baker, she said that Mr. Kelley was wearing a pair of white work gloves. She testified that she grabbed the blade of the knife and it snapped off. According to her, she then got away from him, ran into the dining room, grabbed a telephone, and dialed 911. She testified that Mr. Kelley came into the dining room, took the telephone from her, pinned her down, and started *Page 9 
punching her. She also testified that he was "pulling [her] hair and trying to snap [her] neck." She said that she felt helpless and was giving up, when Mr. Baker started hitting Mr. Kelley with the frying pan. She said that she still had the knife blade in her hand and started stabbing at Mr. Kelley with it. Mr. Kelley released his hold on her, and she and Mr. Baker ran to the front door, which he got open. She ran to a neighbor's house, still carrying the blade of the steak knife.
 {¶ 15} When the police arrived, they found Mr. Baker lying beside the street across from his house. He was covered with blood and was bleeding from a wound in his neck. He was talking to the 911 dispatcher on a telephone he had taken from a neighbor's house. Ms. Lutz was inside a different neighbor's house.
 {¶ 16} Upon entering Mr. Baker's house, police found Ms. Linkous's body in the living room, reclining against the loveseat. Her head and upper back were on the loveseat and the lower part of her body was on the floor in front of it. Her shirt and bra were pulled up, exposing her breasts, and her underpants were askew.
 {¶ 17} Mr. Kelley was lying on the couch adjacent to the loveseat. A paramedic who treated him said that his breathing was shallow, but his pulse was strong. Both his wrists were slit, and he had superficial stab wounds to his abdomen and shins. The wounds on his wrists were from one side to the other, and the paramedic described them as "pretty significant." The blood, however, was oozing from them as opposed to squirting as it would have if the bleeding had been arterial. The paramedic testified that Mr. Kelley's eyes were closed most of *Page 10 
the time, but they "would occasionally open a little bit, and then close back up." Police found a steak knife a few feet from the couch that had Mr. Kelley's blood and left palm print on it.
 {¶ 18} A scientist from the Ohio Bureau of Criminal Identification and Investigation forensic biology DNA unit testified that Mr. Kelley could not be eliminated as the source of sperm found on Ms. Linkous's underpants. She further testified that the chance of finding that profile was 1 in 130,800,000,000 individuals. She also testified that three samples of DNA found inside a work glove found at the scene were consistent with Mr. Baker, Mr. Kelley, and Ms. Linkous.
 {¶ 19} The DNA profile from a swabbing of Ms. Linkous's right nipple was consistent with a mixture containing contributions from Ms. Linkous and Mr. Kelley. An additional, unidentified DNA type was also detected at one location on her right nipple.
 {¶ 20} The Lorain County Grand Jury returned a nineteen count indictment against Mr. Kelley. It charged him with two counts of aggravated murder that included capital specifications, two counts of murder, and single counts of felonious assault, kidnapping, aggravated robbery, and attempted rape in connection with Ms. Linkous. It charged him with two counts of attempted aggravated murder, two counts of attempted murder, and a single count of felonious assault in connection with Mr. Baker and two counts of attempted *Page 11 
aggravated murder, two counts of attempted murder, and a single count of felonious assault in connection with Ms. Lutz. Finally, it charged him with one count of tampering with evidence. The jury found him guilty on the two counts of murder and the single count of felonious assault in connection with Ms. Linkous; on the two counts of attempted aggravated murder, two counts of attempted murder, and the single count of felonious assault in connection with Mr. Baker; and the two counts of attempted aggravated murder, two counts of attempted murder, and the single count of felonious assault in connection with Ms. Lutz. It found him not guilty on the two counts of aggravated murder and the single counts of kidnapping, aggravated robbery, and attempted rape in connection with Ms. Linkous and on the single count of tampering with evidence. The trial court sentenced him to prison for 15 years to life on the first count of murder in connection with Ms. Linkous and determined that the second murder count and the felonious assault count in connection with Ms. Linkous were allied offenses of similar import with the first murder count. It sentenced him to prison for eight years on the first count of attempted aggravated murder in connection with Mr. Baker and determined that the second attempted aggravated murder, the two attempted murder, and the felonious assault counts in connection with Mr. Baker were all allied offenses of similar import with the first count of attempted aggravated murder in connection with him. Similarly, it sentenced him to prison for eight years on the first count of attempted aggravated murder in connection *Page 12 
with Ms. Lutz and determined that the second attempted aggravated murder, the two attempted murder, and the felonious assault counts in connection with Ms. Lutz were all allied offenses of similar import with the first count of attempted aggravated murder in connection with her. Finally, the trial court directed that the three sentences run consecutively, for an aggregate sentence of 31 years to life.
 SUFFICIENCY OF THE EVIDENCE {¶ 21} The first part of Mr. Kelley's first assignment of error is that his convictions are not supported by sufficient evidence. Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. State v. Thompkins, 78 Ohio St. 3d 380, 386
(1997); State v. West, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶ 33. This Court must determine whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror of Mr. Kelley's guilt beyond a reasonable doubt.
 {¶ 22} Although the jury found Mr. Kelley guilty on two counts of murder and one count of felonious assault in connection with Ms. Linkous, the trial court only "convicted" him on the first murder count, because that was the only count on which it sentenced him. See R.C.2941.25(A); Ohio Crim.R. 32(C). In regard to the alleged crimes against Ms. Linkous, therefore, the only issue raised by Mr. Kelley's sufficiency argument is whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror of Mr. *Page 13 
Kelley's guilt beyond a reasonable doubt on the first murder count. SeeState v. Hike, 5th Dist. No. 98AP-1126, 1999 WL 431058 at *3 (June 29, 1999).
 {¶ 23} The first murder count in connection with Ms. Linkous charged him with violating Section 2903.02(A) of the Ohio Revised Code by purposely causing her death. In determining whether evidence is sufficient to support a conviction, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." State v.Jenks, 61 Ohio St. 3d 259, syllabus paragraph one (1991).
 {¶ 24} Ms. Linkous was alive and uninjured when Mr. Baker and Ms. Lutz went to bed. When they were awakened, she was dead. Mr. Kelley was in the room in which she died, and there was no evidence that any other person entered the house or that room between the times Mr. Baker and Ms. Lutz went to bed and when they were awakened. Mr. Kelley could not be excluded as the source of sperm that was found on Ms. Linkous's underpants. The Lorain County Coroner testified that Ms. Linkous was manually strangled. That is, someone strangled her to death with his or her hands, which, according to the Coroner, would have taken between six and a half and seven minutes. Although the evidence against Mr. Kelley was circumstantial, that evidence was sufficient to permit the jury to conclude, beyond a reasonable doubt, that he purposely caused Ms. Linkous's death. To the extent Mr. Kelley's first assignment of error is addressed to the *Page 14 
sufficiency of the evidence to support his conviction for murdering Ms. Linkous, therefore, it is overruled.
 {¶ 25} Although the jury found Mr. Kelley guilty on two counts of attempted aggravated murder, two counts of attempted murder, and one count of felonious assault in connection with Mr. Baker and two counts of attempted aggravated murder, two counts of attempted murder, and one count of felonious assault in connection with Ms. Lutz, the trial court only "convicted" him on the first attempted aggravated murder count in connection with Mr. Baker and the first attempted aggravated murder count in connection with Ms. Lutz. See R.C. 2941.25(A); Ohio Crim.R.32(C). The first attempted aggravated murder counts in connection with both Mr. Baker and Ms. Lutz charged Mr. Kelley with attempting to violate Section 2903.01(A) of the Ohio Revised Code. Under Section2923.02(A) of the Ohio Revised Code, a person is guilty of an attempt to commit an offense for which purpose is sufficient culpability, if he purposely engages in conduct that, if successful, "would constitute or result in the offense." Under Section 2903.01(A), a person is guilty of aggravated murder if he "purposely, and with prior calculation and design, cause[s] the death of another." The issue presented by Mr. Kelley's sufficiency argument as it relates to the alleged crimes against Mr. Baker and Ms. Lutz, therefore, is whether, viewing the evidence in a light most favorable to the prosecution, it would have convinced an average juror, beyond a reasonable doubt, that he purposely, and with prior calculation and *Page 15 
design, engaged in conduct that, if successful, would have resulted in their deaths. See State v. Hike, 5th Dist. No. 98AP-1126, 1999 WL 431058
at *3 (June 29, 1999).
 {¶ 26} The phrase "prior calculation and design," as used in Section2903.01(A), "indicate[s] studied care in planning or analyzing the means of the crime, as well as a scheme encompassing the death of the victim." 1973 Committee Comment to H 511. The Ohio Supreme Court has held that there is no bright-line test for determining whether a defendant has acted with "prior calculation and design" within the meaning of Section2903.01(A). State v. Taylor, 78 Ohio St. 3d 15, 20 (1997). Rather, each case turns on the facts and evidence presented at trial. Id. The circumstances, however, must show "more than momentary deliberation." 1973 Committee Comment to H 511.
 {¶ 27} The evidence in this case, viewed in a light most favorable to the prosecution, shows that, after strangling Ms. Linkous, Mr. Kelley locked the dead bolt on the front door, put on gloves, retrieved a steak knife, went upstairs, and attacked Mr. Baker, stabbing him and slitting his throat. He then followed Ms. Lutz downstairs, grabbed her by the hair as she was trying to get out the side door, pinned her against the wall, and began stabbing at her with the steak knife. When she broke the blade off the knife, ran in the dining room, and called 911, he caught her, pinned her down, started punching her, and was "pulling [her] hair and trying to snap [her] neck." The jury could have reasonably found that, after strangling *Page 16 
Ms. Linkous, Mr. Kelley decided he needed to kill Mr. Baker and Ms. Lutz to avoid detection, made preparations, and set about attempting to do so. If believed, the evidence shows more than momentary deliberation. The evidence is sufficient to support the jury's finding that Mr. Kelley "purposely, and with prior calculation and design," engaged in conduct that, if successful, would have caused Mr. Baker's and Ms. Lutz's deaths. R.C. 2903.01(A). To the extent Mr. Kelley's first assignment of error is addressed to the sufficiency of the evidence to support his convictions for attempted aggravated murder in connection with Mr. Baker and Ms. Lutz, it is overruled.
 MANIFEST WEIGHT {¶ 28} The second part of Mr. Kelley's first assignment of error is that his convictions are against the manifest weight of the evidence. When a defendant argues that his convictions are contrary to the weight of the evidence, this court must review and weigh all the evidence that was before the trial court:
 [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten, 33 Ohio App. 3d 339, 340 (1986).
 {¶ 29} As mentioned at the outset, Mr. Kelley suggested that Ms. Linkous's boyfriend came to the house and into the room where he and Ms. Linkous were sleeping and strangled her without awakening him. The boyfriend testified that, *Page 17 
when he got home after having left Ms. Linkous at the Time Out, he turned off his telephone and went to bed. He said that, when he awakened, he turned his telephone back on and saw that he had missed some calls from Ms. Linkous. He talked to her around 2:00 a.m. According to him, she wanted a ride home, but, because he did not have a license and because he thought police would be out, he was unwilling to go pick her up. He gave the telephone to her mother, who was going to go get her, but then Ms. Linkous called back and said she had gotten a ride.
 {¶ 30} Ms. Linkous's boyfriend sent her a number of increasingly irritated text messages, beginning at 4:28 a.m. In the first, he said that maybe she had found a better life in the bars and that he hoped she enjoyed her new life. In a message at 5:47 a.m., he said that he was going to "pack [his] stuff and that she could get his telephone turned off. At 5:53 a.m., they spoke on the telephone for 20 minutes. According to the boyfriend, she wanted him to come pick her up and gave him partial directions to Mr. Baker's house, but he was unwilling to go get her because it was still dark. They spoke again for almost three minutes at 6:22 a.m. He testified that he then went back to sleep and did not awake until police came at approximately 1:30 p.m. and told him and Ms. Linkous's mother that Ms. Linkous was dead.
 {¶ 31} In his closing argument, Mr. Kelley's trial lawyer pointed to the text messages as evidence that Ms. Linkous's boyfriend was upset with her. He noted *Page 18 
that a former boyfriend of Ms. Linkous had testified that he had seen her current boyfriend become jealous when she spoke to other people; including having seen him grab her arm and shake her. His trial lawyer also pointed out that Ms. Linkous's body had mistakenly been refrigerated, which made it impossible to recover fingerprints from her neck, and that no attempt had been made to recover fingerprints from the deadbolt on the front door in order to either confirm that Mr. Kelley had locked it or to determine whether prints from someone other than Mr. Kelley were on it. He pointed to the unidentified DNA on Ms. Linkous's right nipple as possible evidence that another person may have been present when she died and noted that police had failed to obtain either fingerprints or a DNA sample from Ms. Linkous's boyfriend.
 {¶ 32} This Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by concluding that Mr. Kelley strangled Ms. Linkous. In order to accept the theory that her boyfriend rather than Mr. Kelley killed her, the jury would have had to have believed that her boyfriend left home undetected by Ms. Linkous's mother, found and entered Mr. Baker's house undetected by Mr. Baker, Ms. Lutz, or Mr. Kelley, and strangled Ms. Linkous without awakening Mr. Kelley, who was sleeping in the same room a few feet away. He then would have had to have locked the deadbolt, which Mr. Baker testified could only be locked from the inside without a key, and returned home, again undetected. Of course, acceptance of Mr. Kelley's theory would also have *Page 19 
required the jury to believe that, coincidentally, after sleeping through Ms. Linkous's murder, he was attacked for no apparent reason by Mr. Baker when he went upstairs to offer Ms. Lutz a ride home. The jury did not lose its way by reaching the conclusion the circumstantial evidence tended to prove; that Mr. Kelley murdered Ms. Linkous.
 {¶ 33} In his closing argument, Mr. Kelley's trial lawyer pointed out, among other things, that, although Mr. Baker and Ms. Lutz both testified at trial that Mr. Kelley wore a pair of Mr. Baker's work gloves during his attack on them, Mr. Baker, in his initial statement, said that Mr. Kelley wore a pair of surgical gloves. Mr. Kelley's trial lawyer also pointed out that 1 in every 258 individuals could have contributed the DNA found in the work gloves that was consistent with Mr. Kelley and that a bloody palm print recovered from a window sill near the side door tended to prove that Mr. Kelley was not wearing gloves while struggling with Ms. Lutz.
 {¶ 34} The jury could have reasonably concluded that Mr. Baker, who was hospitalized recovering from his wounds at the time of his initial statement, simply misspoke when he said Mr. Kelley was wearing surgical gloves. Further, although 1 in 258 individuals could have contributed the DNA attributed to Mr. Kelley in the work gloves, there was nothing beyond Mr. Kelley's speculation about Ms. Linkous's boyfriend to indicate that another individual was present during Ms. Linkous's death or the attacks on Mr. Baker and Ms. Lutz. Finally, the jury could *Page 20 
have reasonably concluded, as suggested by the prosecutor during his closing argument, that Mr. Kelley left the bloody palm print on the window sill while looking for his glasses after Mr. Baker and Ms. Lutz had escaped through the front door.
 {¶ 35} Acceptance of Mr. Kelley's version of the story would have also required the jury to accept that, after Mr. Kelley passed out on the couch, Mr. Baker and Ms. Lutz slit his wrists to make it look like he attempted to commit suicide rather than that, once Mr. Baker and Ms. Lutz had escaped, he cut his own wrists in an actual suicide attempt. This Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice by believing Mr. Baker's and Ms. Lutz's testimony that Mr. Kelley attacked them and disbelieving his testimony that they attacked him.
 {¶ 36} The jury's conclusion that Mr. Kelley purposely caused Ms. Linkous's death and purposely, with prior calculation and design, attempted to cause the deaths of Mr. Baker and Ms. Lutz is not against the manifest weight of the evidence. Mr. Kelley's first assignment of error is overruled.
 MOTION FOR ACQUITTAL {¶ 37} Mr. Kelley's second assignment of error is that the trial court incorrectly denied his motion for acquittal at the close of the State's case and at the close of all the evidence on the two aggravated murder counts; the kidnapping, aggravated robbery, attempted rape, and tampering with evidence counts; and the *Page 21 
four attempted aggravated murder counts. Under Rule 29(A) of the Ohio Rules of Criminal Procedure, a defendant is entitled to acquittal on a charge against him "if the evidence is insufficient to sustain a conviction. . . ."
 {¶ 38} The jury acquitted Mr. Kelley on the two aggravated murder counts and on the kidnapping, aggravated robbery, attempted rape, and tampering with evidence counts. Even if the trial court erred by denying his motion for acquittal on those counts, therefore, that error was harmless beyond a reasonable doubt. Ohio Crim.R. 52(A). Accordingly, to the extent Mr. Kelley's second assignment of error is addressed to those charges, it is overruled.
 {¶ 39} Although the jury found Mr. Kelley guilty on all four attempted aggravated murder counts, two each in connection with Mr. Baker and Ms. Lutz, he was only "convicted" of the first attempted aggravated murder counts in connection with each of them because the trial court determined that the second attempted aggravated murder count in connection with each was an allied offense of similar import with the first attempted aggravated murder counts. Any error in the trial court's failure to grant Mr. Kelley's motion for acquittal on the second attempted aggravated murder counts in connection with Mr. Baker and Ms. Lutz, therefore, was also harmless beyond a reasonable doubt. Ohio Crim.R. 52(A). To the extent Mr. Kelley's second assignment of error is addressed to the second attempted aggravated murder counts in connection with Mr. Baker and Ms. Lutz, it is overruled. *Page 22 
 {¶ 40} Finally, as discussed in connection with Mr. Kelley's first assignment of error, there was sufficient evidence before the trial court to support his convictions on the first attempted aggravated murder counts in connection with Mr. Baker and Ms. Lutz. Review of the record reveals that the evidence was sufficient on those counts, not only at the close of all the evidence, but also at the close of the State's case. Accordingly, Mr. Kelley's second assignment of error is overruled.
 MOTION TO SEVER {¶ 41} Mr. Kelley's third assignment of error is that the trial court incorrectly denied his pretrial motion to sever for trial the charges related to Ms. Linkous from the charges related to Mr. Baker and Ms. Lutz. Because Mr. Kelley's motion to sever was based on Rule 14 of the Ohio Rules of Criminal Procedure as opposed to Rule 8 of the Ohio Rules of Criminal Procedure, he forfeited his opportunity to argue on appeal that its denial was error by failing to renew his motion at the close of the evidence. See State v. Williams, 9th Dist. No. 23560,2008-Ohio-1048, at ¶ 52 (Dickinson, J., concurring). Even if he had renewed his motion, however, this Court would still overrule his third assignment of error.
 {¶ 42} Rule 14 provides that a trial court should order offenses to be tried separately if a defendant will be prejudiced by those offenses being tried together. A prosecutor can rebut a defendant's claim of prejudice by showing either that *Page 23 
evidence of each of the offenses would be admissible "other acts" evidence in a trial of the others or that evidence of the joined offenses is simple and direct. State v. Franklin, 62 Ohio St. 3d 118,122 (1991).
 {¶ 43} Rule 404(B) of the Ohio Rules of Evidence provides that, while other acts evidence is not admissible to prove a person's character in order to show he acted in conformity with that character, it is admissible for other purposes, including to show motive. Evidence tending to show that Mr. Kelley murdered Ms. Linkous would have been admissible in a separate trial of the charges related to his attacks on Mr. Baker and Ms. Lutz in order to supply the motive for those attacks, an effort to avoid detection for killing Ms. Linkous. Similarly, evidence of his attacks on Mr. Baker and Ms. Lutz would have been admissible in a separate trial of the charges related to his killing of Ms. Linkous, because those attacks were the basis of the capital specifications on the aggravated murder charges against him; that he killed Ms. Linkous as part of a course of conduct that included killing or attempting to kill two or more people. See R.C. 2929.04(A)(5).
 {¶ 44} Inasmuch as evidence of Mr. Kelley's crimes against Mr. Baker and Ms. Lutz would have been admissible in a separate trial of the charges against him in connection with Ms. Linkous and evidence of his crimes against Ms. Linkous would have been admissible in a separate trial of the charges against him in connection with Mr. Baker and Ms. Lutz, the charges against him were not improperly joined for trial. Mr. Kelley's third assignment of error is overruled. *Page 24 
 PROSECUTORIAL MISCONDUCT {¶ 45} Mr. Kelley's fourth assignment of error is that he was denied a fair trial by alleged prosecutorial misconduct. He has argued that the State violated Rule 16 of the Ohio Rules of Criminal Procedure by failing to make available, after Ms. Linkous's boyfriend testified on direct examination, a summary of a police interview with the boyfriend and by failing to provide him, prior to trial, a particular DNA report prepared by the Ohio Bureau of Criminal Identification and Investigation.
 {¶ 46} At the close of Ms. Linkous's boyfriend's testimony, Mr. Kelley requested copies of any prior statements the boyfriend may have provided so they could be inspected as permitted by Rule 16(B)(1)(g) of the Ohio Rules of Criminal Procedure. The prosecutor responded that there were no such statements. Later, a Lorain County Sheriff's deputy testified that he had prepared a one-page report of an interview he had conducted with the boyfriend. Mr. Kelley argued to the trial court that the report was a prior statement of the boyfriend and should have been provided by the State for inspection under Rule 16(B)(1)(g) at the completion of the boyfriend's direct testimony.
 {¶ 47} The trial court and the parties questioned the deputy outside the presence of the jury regarding the nature of his report. He testified that he tried to accurately record the boyfriend's statements, but that he had not shown the finished report to the boyfriend or asked him to either verify its accuracy or sign it. *Page 25 
The trial court stated that it believed the question of whether the deputy's report should have been produced for inspection was a close call, but because this was a capital case, it was going to rule that it should have been. The trial court then reviewed the statement and concluded that there were no inconsistencies between the statement and the boyfriend's testimony and, to the extent there were any arguable inconsistencies, they were immaterial.
 {¶ 48} When a police report contains a statement attributed to a witness, but the witness has not signed, adopted, or otherwise approved that statement, it is not a statement subject to in camera inspection under Rule 16(B)(1)(g). State v. Cunningham, 105 Ohio St. 3d 197,2004-Ohio-7007, at ¶ 44. The trial court incorrectly determined that the State should have produced the deputy's report for inspection at the close of the boyfriend's direct testimony, and the State, therefore, did not commit prosecutorial misconduct by failing to do so. To the extent Mr. Kelley's fourth assignment of error is addressed to the deputy's report, it is overruled.
 {¶ 49} As mentioned previously, police found a steak knife with Mr. Kelley's blood and left palm print on it a few feet from the couch on which he was lying. They also found a bloody pair of needle nose pliers near the couch. During his opening statement, Mr. Kelley's lawyer suggested that Mr. Baker, Ms. Lutz, or both of them had used the knife and pliers to slit Mr. Kelley's wrists:
 For some reason Baker and Lutz or Baker or Lutz decided that [Mr. Kelley] had killed [Ms. Linkous], that he had attempted to kill *Page 26 
Baker, attempted to kill Lutz, and they wanted this guy gone. They took the knife with the pliers and they slit [Mr. Kelley's] wrists to make it look like he had killed himself, then he ran out of the house, and they ran out of the house calling for help.
Mr. Kelley's lawyer further suggested during his opening that, while the police did DNA testing on items that would support their theory that Mr. Kelley killed Ms. Linkous and attacked Mr. Baker and Ms. Lutz, they failed to do DNA testing on items that would not have supported their theory:
 And you are going to find out there are some things that the police did do DNA testing on, things that would be consistent with, that establishes that [Mr. Kelley] did these terrible crimes, and left out doing DNA [testing] and fingerprints of things that would have been inconsistent with [Mr. Kelley] having caused these crimes.
 {¶ 50} A scientist from the Ohio Bureau of Criminal Identification and Investigation forensic biology DNA unit testified regarding DNA found on a number of items from the crime scene, including the steak knife with Mr. Kelley's palm print on it. Analysis of those items had been included in a report that had been timely provided to Mr. Kelley's lawyer. The prosecutor then started to ask her whether she had prepared a second report. Mr. Kelley's lawyer asked permission to approach the bench and, out of the jury's hearing, told the court that he had not been provided the second report; a report that indicated that further testing of the steak knife and testing of the pliers had revealed only Mr. Kelley's DNA on them. The prosecutor stated his belief that the report had been provided to Mr. Kelley's lawyer. *Page 27 
 {¶ 51} Following a break, during which the trial court reviewed Mr. Kelley's lawyer's opening statement, the trial court, the prosecutors, and Mr. Kelley's lawyer further discussed the report. Mr. Kelley's lawyer suggested that the report and the scientist's testimony about it should be excluded. He also mentioned the possibility of a mistrial, although he did not move for one:
 It is really too late to go back and correct certain impressions that I tried to make with the Jury regarding these two items that are contained in that report, and since we can't go back, I would think that the proper thing to do would be for the Court to exclude these items from evidence, or more extreme remedy would be for the Court to declare a mistrial.
While noting that it did not believe the State had intentionally failed to provide the report to Mr. Kelley's lawyer, the trial court ruled that the report would not be received in evidence and that the scientist would not be permitted to testify regarding the additional testing:
 I am not going to declare a mistrial . . . because I don't think there has been any prejudice to you at this point, but I feel that given that this Exhibit, from what I'm told, I haven't seen the Exhibit, but what the parties seem to tell me, this Exhibit establishes the only DNA on the pliers on the blade in question is that of Shawn Kelley. That would seem to be inconsistent with [Mr. Kelley's lawyer's] theory advance[ed in] opening statements that Chuck Baker and Tammy Lutz handled these items, as well.
 I am going to prevent the State from introducing Exhibit 354. I am going to prohibit the State's witnesses from discussing anything involving Exhibit 354: testings, the conclusions, what have you, that are involved there. *Page 28 
The trial court warned Mr. Kelley's lawyer that he should be cautious with the State's witnesses so he did not inadvertently ask a question that would call for an answer regarding DNA on the knife or pliers and that he would not be able to make a representation in closing argument that was inconsistent with the facts:
 Now, at this time I will tell you . . . that you might want to proceed with particular caution in your questioning of the State's witness or witnesses so as to not give them the opportunity to respond to a question that I might allow them to respond to that involves these particular items, nor will I allow you in closing arguments to argue something that we all know contrary to the facts. You might argue that the State has presented [no] evidence of tests of those, but you won't argue that there was no DNA on those.
Neither the prosecutors nor Mr. Kelley's lawyer indicated any dissatisfaction with the trial court's handling of this issue.
 {¶ 52} Mr. Kelley has suggested to this Court that he was denied a fair trial because of the State's alleged failure to provide the report and by the trial court's failure to grant a mistrial. As noted above, although Mr. Kelley's trial lawyer mentioned the possibility of a mistrial, he neither moved for one nor complained about the remedy the trial court fashioned. Further, a mistrial was not necessary.
 {¶ 53} Although Mr. Kelley's lawyer had suggested during his opening that Mr. Baker, Ms. Lutz, or both had handled the knife and pliers and had further suggested that the State had failed to do DNA testing on some items, he did not specifically say that it had failed to do DNA testing on the knife and pliers. In fact, as he knew from the one report that he acknowledged receiving, it had done some DNA testing on the knife that indicated that the blood on it was Mr. *Page 29 
Kelley's. He was only prevented from questioning witnesses about why they had not tested for other DNA on the knife and pliers and from arguing that their failure to do so was a result of their rush to judgment. Of course, even if he had been provided the report prior to trial, he would have been prevented from asking those questions and making that argument.
 {¶ 54} Even if it were assumed that the State engaged in prosecutorial misconduct by not providing the report to Mr. Kelley's lawyer, the remedy fashioned by the trial court cured any potential prejudice from that misconduct. To the extent Mr. Kelley's fourth assignment of error is addressed to the DNA report, it is overruled.
 PHOTOGRAPHS {¶ 55} Mr. Kelley's fifth assignment of error is that he was unfairly prejudiced by the admission of "voluminous gruesome, repetitive, and prejudicial photographs." He has specifically complained about photographs from Ms. Linkous's autopsy and photographs of Mr. Baker's and Ms. Lutz's injuries.
 {¶ 56} Under Rules 403 and 611(A) of the Ohio Rules of Evidence, admission of authenticated, relevant photographs is within the trial court's discretion. State v. Watson, 61 Ohio St. 3d 1, 7 (1991). In exercising that discretion, it should determine whether the probative value of each photograph outweighs the danger that it will cause material prejudice to the defendant. Id. *Page 30 
 {¶ 57} Mr. Kelley has complained about the admission of certain of the photographs from Ms. Linkous's autopsy, those exhibits numbered 217 through 240. The Lorain County Coroner testified that the first two, 217 and 218, were "survey photograph[s]," for the purpose of showing what Ms. Linkous's body looked like when it first arrived at the Coroner's office, including the clothing she was wearing. The next one, 219, was for the purpose of showing petechial hemorrhages around her face. Number 220 does not appear to have been referred to by the coroner nor included in the record transmitted to this Court. Exhibits 221 and 222 are photographs of Ms. Linkous's body after her clothing had been removed, from two different angles. Exhibit 223 is a photograph of the front of Ms. Linkous's body from her waist up. Exhibit 224 is a closer photograph of Ms. Linkous's face and neck, showing an abrasion on her jaw line and faint marks along her neck. None of the first seven autopsy photographs about which Mr. Kelley has complained is gruesome or particularly prejudicial. Each is different from the others and, although their probative value is not great, it was not outweighed by the danger that they would unfairly prejudice Mr. Kelley, and the trial court did not abuse its discretion in receiving them.
 {¶ 58} Exhibits 225 through 228 are close-ups of Ms. Linkous's eyes. They were for the purpose of showing extensive hemorrhages around the eyes, which would have been caused by extreme, prolonged pressure. Each of the four is different from the others. While they are disturbing, they are not gruesome. Mr. *Page 31 
Kelley has pointed out that he stipulated that Ms. Linkous had been strangled. As noted by the Ohio Supreme Court in State v. Maurer,15 Ohio St. 3d 239, 265 (1984), however, the fact that a defendant has stipulated to the cause of death does not automatically render autopsy photographs inadmissible. The fact that it took extreme pressure over a six-and-a-half-to-seven-minute period was particularly relevant to Mr. Kelley's suggestion that Ms. Linkous was strangled by someone else while he slept a few feet away. The probative value of exhibits 225 through 228 was not outweighed by the danger they would cause unfair prejudice to Mr. Kelley, and the trial court did not abuse its discretion by receiving them.
 {¶ 59} Exhibit 229 is a photograph of a mole and a bruise on Ms. Linkous's right hip. It is unclear what probative value it has, but it also does not appear to be prejudicial. Similarly, exhibit 230 is a photograph of her ankle. It is unclear what probative value it has, but it also does not appear to be prejudicial. The trial court did not abuse its discretion by receiving exhibits 229 and 230.
 {¶ 60} Exhibits 231 and 232 are photographs of the inside of Ms. Linkous's scalp, showing a hemorrhage. The Coroner testified that the hemorrhage would have been caused by a blow to her head. These photographs are gruesome. Their probative value, however, is not outweighed by their potential prejudicial effect. The trial court did not abuse its discretion by receiving them.
 {¶ 61} Exhibits 233 and 234 are photographs of Ms. Linkous's windpipe, which the Coroner had incised to show extensive hemorrhaging. Again, these two *Page 32 
photographs are gruesome. Their probative value is not outweighed by their potential prejudicial effect, and the trial court did not abuse its discretion by receiving them.
 {¶ 62} The final six autopsy photographs about which Mr. Kelley has complained are photographs of Ms. Linkous's hyoid bone, which is commonly referred to as the Adam's apple. The Coroner explained that the hyoid bone is commonly damaged if there is neck compression. The photographs show the bone lying on a blue background. The first two show the bone, at slightly different angles. The last four document the Coroner manipulating the bone with two pairs of surgical tools to show that it was fractured. The photographs are not gruesome and their probative value was not outweighed by the danger that they would cause unfair prejudice to Mr. Kelley.
 {¶ 63} Mr. Kelley has complained about eight photographs of Mr. Baker that were taken while he was hospitalized recovering from his stab wounds and his cut throat. Those photographs, exhibits 112, 113, and 364 through 369, show a number of sutured wounds on Mr. Baker's body. They are neither gruesome nor repetitive. Particularly in view of Mr. Kelley's testimony that Mr. Baker was inadvertently stabbed and his throat cut while he and Mr. Kelley struggled on the waterbed, they were particularly probative. The trial court did not abuse its discretion by receiving them. *Page 33 
 {¶ 64} Finally, Mr. Kelley has complained about 23 photographs of Ms. Lutz's injuries, exhibits 127-146 and 160-162. The photographs showed bruises and swelling around her face, as well as wounds to various parts of her body. Some of the photographs were repetitive, but not overly so. They were particularly probative because the extent of her injuries would have assisted the jury in determining whether to believe her story or Mr. Kelley's story about the struggle between them. The trial court did not abuse its discretion by receiving these 23 photographs into evidence.
 {¶ 65} There were additional autopsy photographs and additional photographs of Mr. Baker's injuries received in evidence. This Court has not addressed those additional photographs because Mr. Kelley has not assigned the trial court's receiving them as error. Mr. Kelley's fifth assignment of error is overruled.
 THIS COURT'S BRIEFING SCHEDULE {¶ 66} Mr. Kelley's sixth assignment of error is that this Court denied him due process by not affording him adequate time to file his brief. This Court is not aware of any authority that would allow it to review its own errors in the manner requested by Mr. Kelley. Assuming that this is an appropriate assignment of error, however, it is overruled.
 {¶ 67} In his brief, Mr. Kelley has asserted that this Court only granted him one extension of twenty days and, because of the extensive record, that was not *Page 34 
sufficient. Review of the docket, however, reveals that this Court in fact granted Mr. Kelley a second extension. With that second extension, his brief was due on April 9, 2007. Despite that, he filed his brief on March 20, 2007. Mr. Kelley's sixth assignment of error is overruled.
 SENTENCING {¶ 68} Mr. Kelley's seventh assignment of error is that the trial court violated his constitutional rights by directing that his sentences be served consecutively. The offenses in this case were committed on January 1, 2005. At that time, Ohio's felony sentencing statute required trial courts to impose concurrent prison terms and to impose the minimum prison terms provided by statute, unless the court made certain findings of fact at the sentencing hearing. On February 27, 2006, approximately three months before Mr. Kelley's trial, the Ohio Supreme Court decidedState v. Foster, 109 Ohio St. 3d 1, 2006-Ohio-856. In Foster, the Supreme Court applied the rules stated in Apprendi v. New Jersey,530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), to Ohio's sentencing statutes. Id. at ¶ 5. In doing so, it held that the statutory requirement for judicial factfinding unconstitutionally deprived defendants in criminal cases of the right to a jury trial under the Sixth Amendment. Id. at ¶ 82. It remedied this constitutional deficiency by excising Sections 2929.14(B), 2929.14(D)(2)(b) and (D)(3)(b), 2929.19(B)(2), and 2929.41 of the Ohio Revised Code, leaving trial courts with the discretion to impose prison terms of any length within the statutory *Page 35 
range and to impose consecutive prison terms, without making findings of fact. Id. at ¶ 97. Since Foster, trial courts may impose consecutive sentences under facts that would have previously supported only concurrent sentences and may impose longer sentences in cases that once would have supported only minimum sentences. Mr. Kelley has argued that, because he was convicted of offenses that occurred beforeFoster was decided, and because Ohio's sentencing procedure afterFoster potentially subjects him to a more severe sentence than he would have faced if he had been convicted before Foster, the application of the post-Foster sentencing procedure amounts to an ex post facto law. He has further argued that Foster "improperly violates the Separation of Powers and violates the Rule of Lenity."
 {¶ 69} "Both the United States and Ohio Constitutions prohibit ex post facto legislation, and similar restrictions have been placed on judicial opinions." State v. Ross, 9th Dist. No. 23375, 2007-Ohio-1265, at ¶ 9
(citing Bouie v. City of Columbia, 378 U.S. 347 (1964)). The retroactive application of a judicial opinion can violate the Due Process Clause — not the Ex Post Facto Clause — if the opinion construes a criminal statute in a manner that "is unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue[.]"Id. (quoting Bouie, 378 U.S. at 354).
 {¶ 70} In Ross, this Court held that the remedy fashioned by the Supreme Court in Foster does not violate the Due Process Clause or the Ex Post Facto *Page 36 
Clause. Id. at ¶ 10-12. Foster did not change the range of sentences that can be imposed on a defendant for committing a felony. "[B]ecause criminal defendants were aware of the potential sentences at the time they committed their crimes, and because the remedial holding ofFoster was not unexpected, Foster did not violate due process notions."Id. at ¶ 12 (quoting State v. Gibson, 10th Dist. No. 06AP-509,2006-Ohio-6899, at ¶ 16). Accordingly, Mr. Kelley's sentence, which complied with Foster, did not violate the Ex Post Facto Clause or the Due Process Clause.
 {¶ 71} Mr. Kelley has also argued that, by excising parts of Ohio's sentencing statute, the Supreme Court violated the constitutional principle of separation of powers. See Cleveland Bar Assn v.Picklo, 96 Ohio St. 3d 195, 2002-Ohio-3995, at ¶ 4. According to Mr. Kelley, the Ohio Supreme Court encroached on the province of the General Assembly by excising the unconstitutional provisions of Ohio's sentencing statute and holding that the remaining provisions left trial courts with the discretion to sentence defendants to consecutive prison terms and to prison terms anywhere within the range provided for the offense by statute. Mr. Kelley has argued that the statute remains in effect to the extent that defendants may only be sentenced to consecutive and non-minimum prison terms after the trial court finds certain facts, and that, because Apprendi, Blakely, and Foster held such judicial factfinding to be unconstitutional, the only appropriate remedy is for trial courts to always impose concurrent, *Page 37 
minimum sentences. According to Mr. Kelley, in Foster, the Supreme Court impermissibly modified the sentencing statute by granting trial courts discretion to impose consecutive and non-minimum sentences.
 {¶ 72} The Court in Foster noted that the remedy of excising the unconstitutional provisions of the sentencing, thereby making sentencing practices discretionary, was similar to the remedy fashioned inUnited States v. Booker, 543 U.S. 220 (2005). State v. Foster,109 Ohio St. 3d 1, 2006-Ohio-856, at ¶ 90. In Booker, the United States Supreme Court excised parts of the federal sentencing statute that violated the Sixth Amendment right to jury trial. Booker, 543 U.S. at 259. By doing so, the Supreme Court, in effect, converted the Federal Sentencing Guidelines from mandatory considerations to discretionary considerations. Id.; Foster, 2006-Ohio-856, at ¶ 90. When sentencing is left to the trial court's discretion, the Sixth Amendment right to a jury trial is not offended. Foster, 2006-Ohio-856, at ¶ 90 (citingBlakely v. Washington, 542 U.S. 296, 308-309 (2004).
 {¶ 73} Finally, Mr. Kelley has argued that Foster violates the Rule of Lenity. Section 2901.04(A) of the Ohio Revised Code codifies the Rule of Lenity, providing that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." The rule of lenity applies only when there is a conflict between criminal statutes or when a statute is ambiguous. Ross, 2007-Ohio-1265, at ¶ 14; Albernaz v. UnitedStates, *Page 38 450 U.S. 333, 342 (1981). Mr. Kelley has not identified any particular conflict or ambiguity in Ohio's sentencing statute; therefore the Rule of Lenity and Section 2901.04(A) do not apply to this case.Ross, 2007-Ohio-1265, at ¶ 14.
 III. {¶ 74} The transcript in this case reveals a well-tried case. The trial judge, the prosecutors, and Mr. Kelley's trial lawyer were well prepared and conducted themselves professionally. Mr. Kelley's assignments of error are overruled, and the judgment of the Lorain County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this *Page 39 
judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
Carr, P. J. Reece, J. Concur
(Reece, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.) *Page 1